## BERRY et al. v. 34 IRVING PLACE CORPORATION.

District Court, S. D. New York.

Nov. 24, 1943.

Victor J. Herwitz, of New York City (James L. Goldwater, of New York City, of counsel), for plaintiffs.

McLanahan, Merritt & Ingraham, of New York City (Robert R. Bruce, of New York City, and John J. Boyle, of New York City, of counsel), for defendant.

Douglas B. Maggs, Solicitor, of Washington, D. C., and John K. Carroll, Regional Atty., of New York City, (Irving J. Levy, Associate Solicitor, of Washington, D. C., and Sidney R. Snitkin, of New York City, of counsel), for Adm'r of Wage and Hour Division of Department of Labor, amici curiae.

RIFKIND, District Judge.

This action is another of the numerous lawsuits, affecting building service employees in the City of New York, which have followed in the wake of Kirschbaum v. Walling, 1942, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638. On behalf of themselves and their fellow employees similarly situated, plaintiffs seek to recover overtime compensation, an equal addition-

878

al amount as liquidated damages, and their attorneys' fee, under Section 16 of the Fair Labor Standards Act, 52 Stat. 1069, 29 U.S.C.A. § 216. The period of time embraced in the action is from October 24, 1938 to February 5, 1942.

During this period defendant owned and operated a 12-story and basement loft and office building at 34 Irving Place, New York City. The rentable area of the building during 1938 and 1939 was 69,855 square feet, and during 1940, 1941 and 1942, 69,915 square feet. On the average, 55 tenants occupied the premises.

Plaintiff Berry was employed as a passenger elevator operator, plaintiff Azcano, as a handyman. They performed the services commonly associated with these occupations.

## I. Coverage

On the question whether plaintiffs are covered by the provisions of the Act, 29 U.S.C.A. § 201 et seq., there is dispute both on the facts and the law. The defendant contends that the percentage of space occupied by tenants who engaged to some extent in the production of goods for commerce was 15 per cent in 1938, 25 per cent in 1939, 27 per cent in 1940, 31 to 33 per cent in 1941, and 41 per cent in 1942. Plaintiffs' analysis of the evidence leads to the following percentages: 1938, 51.5 per cent; 1939, 54.3 per cent; 1940, 53.5 per cent; 1941, 61.8 per cent; 1942, 65.5 per cent.

■ Plaintiffs' figures are too high. They use as a basis for their calculations an approximate rentable area of 65,000 square feet. The correct figures are in excess of 69,000 square feet, as previously stated. Style-Rite Hosiery Company was not engaged in the production of goods for commerce at the defendant's premises. All it maintained there was an office for the receipt and transmission of orders. It should be excluded. For the same reason, W. J. Wickenheiser should be excluded from the calculation. The Turner Subscription Agency conducted a business of receiving magazine subscriptions and forwarding them to publishers. The character of its activities did not differ materially from that of a sales representative. I do not think it was engaged in the production of goods for commerce as these terms are defined in the statute.

■ The defendant's figures are too low. It excluded all tenants not engaged in manufacturing on the premises. Its conception of the meaning of "production" is too narrow. The statutory definition includes "handling," Section 3(j). The tenants who filled orders from stock maintained on the premises were engaged in handling goods and, therefore, engaged in production. The defendant should, therefore, have included E. G. Mantius, A. L. Metzger and Zahn Dental Supply Company. Electric Die Company fits into this category likewise, but the amount of its shipments in commerce was less than 5 per cent of its business, and continued for only a portion of the period under consideration. I, therefore, exclude it from the calculation. Federated Press was engaged in news gathering and news dissemination throughout the country. It prepared and shipped to its subscribers news and articles in written form. It was, therefore, engaged in the production of goods for commerce. See Lenroot v. Western Union Telegraph Company, D.C.S.D.N.Y. 52 F. Supp. 142, decided Oct. 7, 1943.

■ I exclude Jacob Bast from among those engaged in the production of goods for commerce for the reason that the amount of such activity on his part was too trivial, both relatively and absolutely, to warrant consideration. I also exclude Eagle Glove Company for the reason that the evidence fails to show what percentage of its total activity, or what amount of its activity, was in the production of goods for commerce. In the foregoing classification no attempt has been made to determine whether any of the tenants were engaged in commerce. This omission is founded on the proposition that even if it be found that some of the tenants were engaged in commerce, such a finding would not warrant the inference in this case that the plaintiffs were engaged in commerce. Stoike v. First National Bank, 1943, 290 N.Y. 195, 48 N. E.2d 482; Johnson v. Dallas Downtown Development Co. 5 Cir., 1942, 132 F.2d 287, certiorari denied 318 U.S. 790, 63 S. Ct. 994, 87 L.Ed. ——.

In summary, I find that 18 tenants were engaged to some extent in the production of goods for commerce; that some were so engaged to the extent of 100 per cent of their activity and some to as little as six per cent. Without making an exceedingly tedious and precise calculation, it is clear that less than 50 per cent of the activity conducted at the defendant's building was activity which may be called the production

of goods for commerce. Since under the statute the test is the nature of the employees' activity, which in this case was general in the operation of the building for all tenants, it should be inferred that less than 50 per cent of the plaintiffs' activity was in the production of goods for commerce.

■ Defendant maintains that such a finding is fatal to the claim here asserted. It argues that, unless the major portion of the plaintiffs' activity is within the statutory classification, they are not entitled to the benefits of the statute. In support of its argument, it cites Section 13(a) (2) of the Act, which exempts from the provisions of Sections 6 and 7 "any employee engaged in any retail or service establishment the *greater part* of whose selling or servicing is in intrastate commerce." The suggestion is advanced that the measure of "greater part" should likewise be extended to determining whether an employee is engaged in the production of goods for commerce; but this argument is double-edged. It may, with equal force, be said that, since Congress omitted the test of Section 13(a) (2) from the provisions of Sections 6 and 7 and from the definition in Section 3(j), it had no intention of putting both matters on the same footing. And that seems the more logical; for the implication of Section 13(a) (2) is that an employee *otherwise covered by the Act* is excluded if the *establishment* wherein he is employed is of the character therein described.

In the Kirschbaum case the Court said, "Concededly, in both cases the tenants of the buildings are principally engaged in the production of goods for interstate commerce." Page 519 of 316 U.S., page 1118 of 62 S.Ct., 86 L.Ed. 1638. The Court did not hold, however, that the presence of that fact was a necessary condition to the subjection of the employers to the Act.

In Warren-Bradshaw Drilling Company v. Hall, 1942, 317 U.S. 88, 63 S.Ct. 125, 127, 87 L.Ed. ——, the Court recited the fact that "some of the oil produced ultimately found its way into interstate commerce." The Court did not say how much, nor whether the amount made any difference.

■ The nearest we come to a standard of measure is stated in Walling v. Jacksonville Paper Company, 1943, 317 U.S. 564, 572, 63 S.Ct. 332, 337, 87 L.Ed. ——, where the Court held that "If a substantial part of an employee's activities related to goods whose movement in the channels of interstate commerce was established by the test we have described, he is covered by the Act."

■ "A substantial part" is not a phrase of mathematical precision. For the purposes under consideration, I think it is satisfied by less than 50 per cent. I do not think that in the context in which it is used by the Supreme Court, "substantial" means the same as when it is used in the phrase, "substantial performance of a contract." I construe the language to mean the converse of insubstantial or immaterial. See, Schainman v. Dean, 9 Cir., 1928, 24 F.2d 475, 476. By such a standard, I find that a substantial part of the plaintiffs' activities was in the production of goods for commerce.

■ Defendant argues further, on the issue of coverage, that plaintiffs have not sustained the burden of showing what part of their work was in production for intrastate and what part for interstate commerce. It relies upon Super-Cold Southwest Co. v. McBride, 5 Cir., 1941, 124 F. 2d 90. Perhaps such a division is possible, where an employee is engaged in two distinct, or at least separable, lines of activity. It is clearly beyond the possibilities in the case of an elevator operator or a handyman in a multi-tenant loft and office building. To impose such a burden upon the employee in such a case is effectively to deny him the relief contemplated by the statute. In so far as the Super-Cold case suggests that the employee must further segregate his overtime from his regular time, and show what part of his overtime was in interstate commerce, I cannot bring myself to assent to such a proposition. Nowhere in the statute do I find a warrant for such a rule. Nor can I discover anything in Walling v. Jacksonville Paper Co., supra, which makes such a segregation useful. See Davis v. Goodman Lumber Co., 4 Cir., 1943, 133 F.2d 52; Petway v. Dobson, D.C.M.D. Tenn. 1942, 43 F.Supp. 277; 56 Harvard Law Review, 140. Could the employees in Warren-Bradshaw Drilling Co. vs. Hall, supra, have offered proof to show what part of their preliminary drilling work would contribute to the oil passing into interstate commerce and what part in intrastate commerce? The Supreme Court did not seem to be concerned with that classification. Assuming that the rule in the Super-Cold case has validity, it does not bear application in situations where the conditions of employment determined by

the employer make the precise apportionment between intrastate and interstate activity impracticable.

## II. Reformation

As an affirmative defense and as a counterclaim, defendant alleged that it had entered into, was bound by and had carried out the terms of collective bargaining agreements with Locals 32B and 164 of the Building Service Employees International Union; that plaintiffs were members of said union or had individually accepted the collective bargaining agreements; that the agreements were entered into and carried out by plaintiffs and defendants in the mutual and bona fide belief that plaintiffs were not engaged in commerce or in the production of goods for commerce, and that the Fair Labor Standards Act had no application to their employment relationship; that the true intention of plaintiffs and defendant was that the agreements should be in complete conformity with all laws applicable to their employment relationship; and that, but for their mutual mistake of fact and law, they would have provided a formula for the calculation of wages, which would have yielded the wages stipulated in the agreements (like the formula considered in the Belo case, Walling v. Belo Corp., 1942, 316 U.S. 624, 62 S.Ct. 1223, 86 L.Ed. 1716); and prayed for the reformation of the agreements to give effect to the true intention of the parties.

■ As a pleading, I have sustained such a counterclaim and defense, Adams v. Union Dime Savings Bank, D.C. 1943, 48 F.Supp. 1022. Accord: Garritty v. Bagold Corp., 1943, 180 Misc. 120, 42 N.Y.S.2d 257, per Shientag, J. Contra: Bailey v. Karolyna Company, Ltd., D.C. April 10, 1943, 50 F.Supp. 142, per Hulbert, J. As a pleading, I sustain it here. The question is now presented whether the proofs support the allegations.

It should be noted that, unlike the usual reformation case where the party resisting reformation relies upon the agreement as written to govern the relations of the parties, here the plaintiffs, resisting reformation, do not seek to recover under the agreements but desire to use them merely as a stepladder to reach the benefits of the statute. Several questions inviting exploration have been argued in this connection; whether it is possible to reform the agreement between plaintiffs and defendant without reforming the agreement between the defendant and the Union, which is not a party to the action; what is the true nature of a collective bargaining agreement, Yazoo & M.V.R. Co. v. Webb, 5 Cir., 1933, 64 F.2d 902; Barth v. Addie Company, 1936, 271 N.Y. 31, 2 N.E.2d 34; Rotnofsky v. Capitol Distributors Corp., 1941, 262 App.Div. 521, 30 N.Y. S.2d 563. In the view I take of the facts, these questions do not demand an answer.

■ In support of its allegations in the counterclaim, defendant offered testimony received at the trial of Greenberg v. Arsenal Building Corporation, D.C.S.D. New York, 50 F.Supp. 700, 703, decided July 12, 1943, per Goddard, J. Plaintiffs made no objection except on the ground of relevance, the claimed irrelevance arising out of the fact that concededly the testimony related to negotiations between the representatives of employer associations, of which the defendant was not a member, and representatives of the Union, of which the plaintiffs were members, but in none of which negotiations did plaintiffs or any of them personally participate.

I think the objection of irrelevance must be overruled, at least as to the statements made by the Union representatives. Whether plaintiffs' relationship to the agreement is that of third party beneficiaries or that of principals acting through an agent, the result is the same. See Barth v. Addie Company, supra; Rotnofsky v. Capitol Distributors Corp. supra. The testimony as to statements by, and the state of mind of the employers' representatives is on less firm ground. In good measure, of course, that testimony is part of the tissue of the negotiations and is essential to an understanding of the statements and intentions of the Union representatives. The remainder is without importance, since there is independent testimony here given by officers of defendant as to defendant's intention and state of mind.

Upon substantially the same record, Judge Goddard in the Greenberg case said, "Defendants therefore cannot get reformation. A mistake of law, if there was any here, would not warrant the granting of such relief. And there is not sufficient evidence in the record to support the allegation of a mistake of fact." I find myself in agreement with my colleague's conclusion but I do not reach the result by the same path.

The division between mistakes of fact and mistakes of law is, at best, an artificial one, and when applied to a question of whether one is engaged in commerce or the production of goods for commerce, the distinction becomes a tool too blunt to be useful. In Eaglesfield v. Marquis of Londonderry (1875) 4 Ch. D. 693, 703, Jessel, M. R., said: "There is not a single fact connected with personal status that does not, more or less, involve a question of law. If you state that a man is the oldest son of a marriage, you state a question of law, because you must know that there has been a valid marriage, and that that man was the first-born son after the marriage, or, in some countries, before. Therefore, to state it is not a representation of fact seems to arise from a confusion of ideas. It is not less a fact because that fact involves some knowledge or relation of law. There is hardly any fact which does not involve it. If you state that a man is in possession of an estate of £10,000 a year, the notion of possession is a legal notion, and involves knowledge of law; nor can any other fact in connection with property be stated which does not involve a knowledge of law."

Bowen, L. J., in West London Commercial Bank v. Kitson (1884) 13 Q.B.D. 360, 363, said: "Suppose I were to say I have a private Act of Parliament which gives me power to do so and so. Is not that an assertion that I have such an Act of Parliament? It appears to me to be as much a representation of a matter of fact as if I had said I have a particular bound copy of Johnson's Dictionary."

(Both quotations are given in 59 Law Quarterly Review 327. See Restatement of the Law of Contracts § 500. That the distinction in the law of reformation of contracts between mistakes of fact and mistakes of law may have had its origin in the maxim of the criminal law, ignorantia iuris non excusat, see 59 Law Quarterly Review 327, 328.)

I need but reexamine my own analysis of the facts and the law on the question of coverage under the statute in this very case to realize that we have here a molecular combination of fact and law which defies separation. What is seen clearly from the record is that the parties to the agreements were mistaken about the aggregate of facts, inferences and opinions which together result in a judgment that one is or is not engaged in the production of goods for commerce. Seriously to urge that the Union representatives were not mistaken is to charge them with fraud. In this connection, I may take judicial notice that there is no substitutional service for the vertical transportation essential to the operation of defendant's building. The bargaining power of the Union representing its employees is, therefore, tremendous. Indeed, the defendant did no more than sign on the dotted line. It first signed a contract for a shorter work-week than was finally adopted and it was accorded the benefits of the latter contract by the grace of the Union. I am satisfied, therefore, that in the making of the union agreement and the individual hiring agreements there was a mutual mistake, that it was a mistake of fact and law, and that it was the kind of mistake from which courts of equity relieve when they can, Hunt v. Rousmanier's, Administrators, 1823, 8 Wheat. 174, 5 L.Ed. 589; Philippine Sugar Estates Development Co., Ltd., v. Gov't of Philippine Islands, 1918, 247 U.S. 385, 38 S.Ct. 513, 62 L.Ed. 1177; Millspaugh v. Cassedy, 1920, 191 App.Div. 221, 181 N.Y.S. 276; Pomeroy, Equity Jurisprudence, 5th Ed., Sec. 849a; 22 Col.L.R. 166.

In order to grant relief here, the Court must be able to discover the true intention of the parties. Restatement of the Law of Contracts Sec. 504. It cannot write a new agreement and substitute it for the agreement of the parties. It cannot inject its own conception of hindsighted fairness as a substitute for the freely consented to arrangement of the parties. In this respect the defendant has failed. I am not instructed by the record as to what contract the parties would have made had they not been mistaken. The defendant says that they would have established an hourly rate for the statutory regular time which, together with the rate of time and a half for overtime, would have aggregated the actual amount stipulated in the contract. It may be that the parties would so have acted, but it is equally possible that knowledge on the part of the Union representatives that the employees were entitled to the benefits of the Act would have stiffened their insistence upon their higher demands.

Moreover, no mistake can now be attributed to the contract of February 1, 1937, which was effective until March of 1939, since the Act was not then in effect, nor even in contemplation. (The history

of the Fair Labor Standards Act began with a message from the President of the United States to the Congress on May 24, 1937, Senate Report 884, 75th Congress, First Session.) So that from October 24, 1938, to March, 1939, the plaintiffs are clearly entitled to, and would have received, higher compensation under the Act than prevailed under the collective agreement then in force. Who can now guess what effect that would have had upon the negotiations in February and March, 1939? Perhaps no strike at all would have been called. We enter a realm of speculation and doubt which it is beyond the power of the judicial process to resolve.

The result is, of course, that defendant is subjected to an unanticipated liability and, innocently, to a large penalty. Under the circumstances of this case the burden is one which, under the admonition of the United States Supreme Court, cannot be shifted elsewhere. Overnight Transportation Company, Inc., v. Missel, 1942, 316 U.S. 572, 583, 62 S.Ct. 1216, 86 L.Ed. 1682.

The parties have stipulated the amount of recovery, if plaintiffs are entitled to recover, and have also agreed upon the amount to be awarded as an attorney's fee to plaintiffs' attorney. Judgment for the plaintiffs will be entered accordingly.