127 So.2d 238 (1961)
L. J. RASHALL, Plaintiff and Appellant,
v.
FALLIN & SAVAGE TIMBER COMPANY, Inc., Defendant and Appellee.
No. 170.
Court of Appeal of Louisiana, Third Circuit.
January 30, 1961.
Jess L. Funderburk, Jr., Leesville, for plaintiff-appellant.
George B. Holstead, Ruston, for defendant-appellee.
Before HOOD, SAVOY, and CULPEPPER, JJ.
CULPEPPER, Judge.
This is a suit for workmen's compensation benefits. Plaintiff alleges that he injured his back while loading a piece of *239 pulpwood on his truck during the course and scope of his employment by the defendant. In its answer the defendant denied the employer-employee relationship and alleged a buyer and seller relationship existed between plaintiff and defendant. After trial on the merits the lower court held that plaintiff was an independent contractor and denied recovery. From this judgment plaintiff has appealed.
The facts are that the defendant, Fallin & Savage Timber Company, Inc., is in the business of procuring pulpwood for sale to its various customers from whom they obtain orders. The defendant operated yards at Simmsboro, Colfax and Tioga (referred to in the record as the Beauregard Yard). International Paper Company had contracted with T. L. James Company, Inc. to purchase pulpwood from lands belonging to the latter and located in Rapides Parish, Louisiana. T. L. James Company, Inc. in turn contracted with the defendant to cut and haul the pulpwood of the type and size specified in their contract. In order to cut and remove the timber from this land, the defendant made an agreement with plaintiff and various other pulpwood haulers who did the actual work of cutting and hauling the pulpwood to the yards of the defendant at Colfax or Tioga. Plaintiff, as well as the other haulers, furnished their own trucks, power saws and other equipment, hired and paid whatever helpers they needed, paid all of their expenses and delivered the wood to yards of the defendant at a unit price of $10 per cord for pine and $9.50 for gum. Defendant paid plaintiff and the other haulers on Friday of each week.
In order to carry out its agreement with T. L. James Company to cut only certain types and sizes of wood from certain designated areas and to cut these areas clean the defendant employed Mr. Tommy Lee as a woods-foreman. Mr. Lee stayed in the woods with the plaintiff and other haulers and instructed them as to what timber to cut, when to cut it and to which yard to haul it. Also at times Mr. Lee required that the plaintiff and others go back over certain tracts to clean up certain timber which had been left by others. The general procedure was that Mr. Lee would assign to each man and his crew a certain strip of land on which they were to cut certain types of wood at certain times.
The evidence shows that plaintiff had been working under Tommy Lee cutting and hauling pulpwood for approximately eight or nine months previous to his injury. On the date of the accident, August 6, 1959, plaintiff and his two helpers were loading pulpwood on plaintiff's truck, when he hurt his back. Plaintiff's testimony regarding the accident is corroborated in detail by both of his helpers who stated that they saw plaintiff when he was hurt, heard him complain immediately thereafter and know that he has not worked since that day except for one morning approximately ten days later when on the advice of Dr. Sewell he went back and tried to work again but could not.
Under the above facts the trial judge was certainly correct in holding that there was no buyer and seller relationship between plaintiff and defendant because plaintiff did not own the timber, it belonged to T. L. James & Company. The lower court found that plaintiff was an independent contractor and denied recovery. Apparently counsel did not call to the attention of the lower court the fact that LSA-R.S. 23:1021(6) was amended by Act 179 of 1948 so as to provide that an independent contractor is covered by the workmen's compensation act if a substantial part of his work time is spent in manual labor in carrying out the terms of the contract.
We do not find it necessary to decide whether Rashall was or was not an employee of the defendant by reason of the control exercised through defendant's employee, Mr. Tommy Lee, because even if plaintiff was only an independent contractor he is clearly included within the protective provisions of LSA-R.S. 23:1021(6) as amended by Act 179 of 1948 which reads as follows:
"`Independent Contractor' means any person who renders service, other *240 than manual labor, for a specified recompense for a specified result either as a unit or as a whole, under the control of his principal as to results of his work only, and not as to the means by which such result is accomplished, and are expressly excluded from the provisions of this Chapter unless a substantial part of the work time of an independent contractor is spent in manual labor by him in carrying out the terms of the contract, in which case the independent contractor is expressly covered by the provisions of this Chapter." (The italicized portion was added by Act 179 of 1948.)
The only reported case interpreting the above statutory provision added by Act 179 of 1948 is Welch v. Newport Industries, 86 So.2d 704, 706, decided by the First Circuit Court of Appeal in 1956 and in which writ of certiorari to the Supreme Court was denied. In the Welch case plaintiff was a logging contractor who grossed $10,000 to $12,000 a month, employed approximately thirty men and used his own trucks, tractors and other equipment. The court found that Welch was an independent contractor but that he drove a pick-up truck daily to transport supplies, built a supply shed with his own hands, occasionally helped to load railroad cars, repaired and maintained machinery, wielded and axe and shovel, used a wheelbarrow and drove a tractor. He was injured while he and a helper were attempting to free a tractor which was struck.
In interpreting the words "substantial part" as used in the above-quoted statute, the court held as follows:
"While in some legal senses `substantial' indeed has the signification of the larger part, such as in `substantial compliance', legally the words `substantial part' also are used not as a term of mathematical precision, but also so as to mean the converse of insubstantial or immaterial.
"As was stated in a federal case interpreting the words `substantial part' in connection with the interpretation of the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., a remedial statute with similar legislative intention and judicial interpretation.
"`"A substantial part" is not a phrase of mathematical precision. For the purposes under consideration, I think it is satisfied by less than 50 per cent. I do not think that in the context in which it is used by the Supreme Court, "substantial" means the same as when it is used in the phrase, "substantial performance of a contract." I construe the language to mean the converse of insubstantial or immaterial. See, Schainman v. Dean, 9 Cir., 1928, 24 F.2d 475, 476. By such a standard, I find that a substantial part of the plaintiffs' activities was in the production of goods for commerce', Berry v. 34 Irving Place Corporation, D.C., 52 F.Supp. 875, at page 879."
In the Welch case supra, the court also interpreted "manual labor" as follows:
"Similarly, `supervisory duties' and contradictory terms for purposes of `manual duties' are not necessarily determining compensation coverage. `Supervisory duties' may include the performance of manual labor so as to entitle the individual employed in the performance thereof to the protection of our Compensation Act. It may technically be `supervisory' to truck supplies or to aid in loading logs, or to unbog; machinery, or maintain machinery in operation, all with the use of one's own hands, but the true legal meaning of the term `manual labor' is to denote work in which the physical element predominates over the mental, see 26 Words and Phrases, Verbo Manual Labor, p. 603. For purposes of determining compensation coverage, the distinguishing feature is whether the working man participates physically himself, rather thanso to speakaloofly directs in clean Sunday clothes." *241 In the instant case defendant argues before this court that there is no testimony in the record to show what amount of manual labor was actually performed by the plaintiff. This argument has no merit. A reading of the record as a whole shows clearly that plaintiff was a very small operator who owned only one truck which he purchased for $500, employed only two helpers, one of whom was his brother, who worked at a wage of $15 per week, that plaintiff actually filed this suit in forma pauperis and that he of necessity worked with his helpers cutting and hauling wood. Plaintiff was actually injured while loading wood onto his truck and then approximately two weeks after his initial injury he tried to return to work but was unable to perform this type of heavy manual labor so he stopped and has not worked since. On this issue the facts of the instant case are much stronger in plaintiff's favor than the facts in the Welch case cited above. Clearly a substantial part of the work time of Rashall was spent in manual labor in carrying out the terms of his contract with the defendant.
The next issue which we will consider is the extent and duration of plaintiff's disability. The day after the accident plaintiff went to see Dr. B. N. Sewell, a general practitioner of Boyce, Louisiana who prescribed a rib brace and muscle relaxing drugs. Dr. Sewell testified that plaintiff's initial complaints were as to his left side but that approximately ten days later he also complained of his back. After seeing and treating plaintiff for ten to fourteen days Dr. Sewell recommended that plaintiff try to go back to work which he did but he was unable to do so. Dr. Sewell's records were incomplete but it was apparently during the first part of September that he referred plaintiff to Dr. Daniel M. Kingsley, an orthopedic surgeon of Alexandria, Louisiana.
Dr. Kingsley testified as a witness for the defendant that he examined plaintiff on September 11, 1959, took X-rays and did a complete orthopedic examination after which he could find no grounds for plaintiff's complaint of pain in his back or left side. It was Dr. Kingsley's opinion that as of the date of his examination plaintiff was fully recovered from any injury which he might have sustained.
On September 4, 1959 plaintiff was examined by Dr. Charles V. Hatchette, an orthopedic surgeon of Lake Charles, Louisiana, who testified in this case on behalf of the defendant. Although Dr. Hatchette could find no positive objective symptoms his diagnosis was that plaintiff had suffered a mild lumbo sacral strain for which he prescribed a back brace and heat treatments. It was Dr. Hatchette's opinion that plaintiff should have been completely recovered and able to return to work in from four to eight weeks from the date of Dr. Hatchette's examination on September 4, 1959.
Dr. Claude Pollard, Jr., a neurological surgeon of Houston, Texas, examined the plaintiff on September 15, 1959 and testified in this case on behalf of the plaintiff. Dr. Pollard found "marked spasm of the erector spinae muscle of the left side", flexion of the spine limited by 15% and marked localized tenderness at L-4 or L-5. His diagnosis was a severe sprain of the lumbo-sacral muscles. Dr. Pollard recommended bed rest for from ten to fourteen days followed by heat treatment, massage and injections of pain-killing drug into the muscle. It was Dr. Pollard's opinion that as of the date of his examination plaintiff was totally disabled from working but he gave no estimate as to the duration of this disability.
On the trial of this case on December 22, 1959, the plaintiff testified that he was still unable to work because of pain in his back and that he had not worked since he left defendant's employment. However, plaintiff admitted that he was no longer under the care of any doctor, that he was not wearing a back brace and that he was not taking any further medication.
*242 As we have shown by the above resume of the expert medical testimony, Dr. Sewell, Dr. Hatchette and Dr. Pollard were all of the opinion that plaintiff was temporarily disabled. Dr. Kingsley alone opined that plaintiff, as of the date of his examination on September 11, 1959, was able to return to work. We have no difficulty in finding under this evidence that plaintiff was totally disabled but the duration of this disability is a more difficult issue. Dr. Hatchette testified that in his opinion plaintiff had suffered only a mild sprain and should be completely recovered within four to eight weeks after the date of his examination on September 4, 1959. Dr. Pollard diagnosed a severe sprain and recommended ten to fourteen days of bed rest followed by diathermy and massage but Dr. Pollard gave no further estimate as to the duration of disability. On the date of the trial on December 2, 1959 plaintiff was admittedly no longer under a doctor's care and was no longer wearing a back brace or taking any medication. Under these facts it is our opinion that plaintiff has not proved he was disabled beyond October 30, 1959 which was the maximum duration of disability predicted by Dr. Hatchette.
Regarding the rate of compensation to be awarded we find plaintiff testified he grossed an average of $150 a week which represents the amount he was paid for cutting and hauling 15 cords of wood. But of these gross earnings he had to pay one helper $4 a cord which totals $60 a week and he paid his other helper a flat salary of $15 a week. Plaintiff also had to pay for his gasoline which he estimated at $15 a week. Of course, plaintiff had to maintain his truck and power saw but the record contains no estimate of these expenses. We find it impossible from the record to determine the average net weekly earnings of plaintiff. However, we find that both Mr. Savage and the plaintiff testified that the average earnings of those who cut and haul pulpwood in this particular area is $1 per hour. Although defendant argues that plaintiff's compensation rate should be computed on the basis of a 5-day week since plaintiff testified that he never worked more than 5 days per week, the decision of the Supreme Court in Carrington v. Consolidated Underwriters, 230 La. 939, 89 So.2d 399, holds explicitly that after determining an employee's daily wage the six-day week is to be employed in calculating his weekly wage for purposes of workmen's compensation.
It is therefore our opinion that plaintiff's earnings for a full day's work averages approximately $8, which computed on the basis of a 6-day week would be $48 per week making his compensation rate $31.20 per week. See Moore v. Pullig et al., La.App., 123 So.2d 826 for a similar holding.
The record shows that defendant paid to the plaintiff three weeks of compensation at a rate of $27.50 and defendant is of course entitled to be credited with the total amount of these payments against the judgment herein awarded.
For the reasons hereinabove set forth the judgment of the lower court is reversed and judgment is rendered herein in favor of the plaintiff and against the defendant for workmen's compensation payments at the rate of $31.20 per week from August 6, 1959 through October 30, 1959 subject to a credit of three weekly payments in the sum of $27.50 previously paid, together with interest at the rate of 5% per annum on all past-due installments until paid and for all medical expenses not to exceed $2,500.
The fee of Jess Funderburk, Jr., attorney for the plaintiff, is fixed at the rate of 20% of the award herein granted. All costs of these proceedings both in the lower court and on this appeal are assessed against the defendant.
Reversed and rendered.