SHAUGHNESSY, REGISTER OF WILLS *v.* LINGUISTIC SOCIETY OF AMERICA ET AL.

[No. 27, October Term, 1951.]

*Decided November 7, 1951.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, HENDERSON and MARKELL, JJ.

*Ward B. Coe, Jr., Assistant Attorney General,* with whom was *Hall Hammond, Attorney General,* on the brief, for appellant.

*Frederick J. Green, Jr., Assistant United States Attorney,* with whom was *Bernard J. Flynn, United States Attorney,* on the brief, for the Attorney General of the United States, appellee.

*John Phelps* for Linguistic Society of America, appellee.

*Charles F. Stein* for the executors, appellees.

DELAPLAINE, J., delivered the opinion of the Court.

This appeal brings to us the question whether a devise of real estate in Baltimore and also certain bequests given by Mrs. Klara H. Collitz, deceased, to the Linguistic Society of America are exempt from the Maryland collateral inheritance tax. Code Supp. 1947, art. 81, sec. 110.

Mrs. Collitz, a philologist, by her will made in 1937, bequeathed to the Linguistic Society, of which she was a member, the library which she and her husband, the late Dr. Hermann Collitz, also a philologist, had collected. By a codicil, executed in 1938, she gave to the society her home located at 1207 North Calvert Street including its bookcases and furniture. By subsequent codicils she left to the society her lecture notes made at the Universities of Oxford, Chicago, Heidelberg and Bonn, and her manuscripts and other papers, and also her husband's papers.

The testatrix died in Baltimore in 1944. In September, 1945, Frederick H. Hennighausen and John Phelps, her executors, requested the Circuit Court of Baltimore City to construe the will and codicils and assume jurisdiction of the administration of the estate. In March, 1947, the Court construed the instruments and assumed jurisdiction.

In August, 1948, the Court ratified the auditor's account, which allowed $318.55 for collateral inheritance

taxes on bequests in the aggregate amount of $4,247.37, but distributed $39,017.06 in real and personal property to the Linguistic Society free of collateral inheritance tax.

The executors tendered $318.55 to John H. Bouse, Register of Wills of Baltimore City, to pay the collateral inheritance taxes, but he declined to accept that sum in full payment for such taxes, claiming that the executors owed an additional tax of $2,926.28 upon the devise and bequests to the Linguistic Society. In July, 1949, the Court, upon petition of the executors, passed an order requiring the Register of Wills to show cause why he should not accept $318.55 in full payment for the collateral inheritance taxes. The Register of Wills answered that the Linguistic Society was not exempt from the tax and prayed that the auditor's account be restated.

The Alien Property Custodian, who succeeded to the rights of a number of residuary legatees who were nationals of Germany, an enemy country, was allowed $1,649.86 in the auditor's account. In 1949 the Attorney General of the United States, who had been designated by Executive Order as successor to the Alien Property Custodian, was authorized to intervene in the case, and he prayed the Court to let the auditor's account stand unchanged.

On March 19, 1951, the Court passed a decree declaring that the devise and bequests to the Linguistic Society were exempt from the tax and again ratifying the auditor's account. The appeal to this Court was taken by Leroy C. Shaughnessy, who became Register of Wills after the death of Mr. Bouse.

The collateral inheritance tax statute imposes a tax of 7½ per cent on the clear value of all property, having a taxable *situs* in this State, passing at the death of any decedent to or for the use of any person or persons, other than the father, mother, husband, wife, children or lineal descendants of such decedent. In 1943 the Legislature added a proviso to the statute exempting from the tax property passing to or for the use of "a corporation, trust or community chest, fund, or foundation, created

or organized under the law of the United States or of any State or territory or possession of the United States, organized and operated exclusively for religious, charitable, scientific, literary or educational purposes, * * * a substantial part or all of the activities and work of which are carried on in the State of Maryland, and no part of the net earnings of which inures to the benefit of any private shareholder or individual." Laws of 1943, ch. 964, Code Supp. 1947, art. 81, sec. 110.

The general rule is that tax exemption statutes are strictly construed in favor of the State, and a claimant cannot obtain an exemption from taxation unless he shows affirmatively that the statute clearly allows him an exemption. However, a tax exemption statute should not be given a strained or unreasonable construction that would defeat the purpose of the Legislature. *Grand Lodge of Maryland, Knights of Pythias v. City of Baltimore,* 157 Md. 542, 146 A. 744; *Pittmann v. Housing Authority of Baltimore City,* 180 Md. 457, 460, 461, 25 A. 2d 466; *State Tax Commission v. Standard Oil Co. of New Jersey,* 181 Md. 637, 640, 31 A. 2d 621; *Clarke v. Union Trust Co. of District of Columbia,* 192 Md. 127, 134, 63 A. 2d 635, 638.

It is admitted that the Linguistic Society of America qualifies as a corporation organized and operated exclusively for scientific, literary or educational purposes. It is also admitted that no part of its net earnings inures to the benefit of any private shareholder or individual. But it is disputed that a substantial part of the activities and work of the society is carried on in the State of Maryland.

One of the meanings of the word "substantial" is strong or solid; having firm or good material; as substantial cloth, substantial steps, or substantial bridge.

Another meaning is wealthy, prosperous and responsible; as a substantial business man.

A third meaning is genuine and sound; having essential value; as substantial criticism.

A fourth meaning is vital and important; as the substantial points of an argument.

A fifth meaning is having real existence; not imaginary; as when Shakespeare said: "All this is but a dream, too flattering-sweet to be substantial."

A sixth meaning is real or true in the main or for the most part. So we speak of substantial success, or a substantial agreement as to the points discussed.

A seventh meaning is pertaining to fundamental right or to the merits, as distinguished from questions of mere form or manner. Thus the right of trial by jury is a substantial right. Likewise, substantial performance of a contract is one that fulfills reasonably well the essential stipulations, though it is deficient in punctuality of performance or in minor details of manner, for which moderate deduction from the stipulated price would give adequate compensation.

Still another meaning of "substantial" is considerable in amount or value. Thus we speak of a substantial profit or a substantial gift to charity. This is the meaning which is undoubtedly applicable to the statute now under consideration. *Tax Commission of Ohio v. American Humane Education Society*, 42 Ohio App. 4, 181 N. E. 557; *Clarke v. Union Trust Co. of District of Columbia*, 192 Md. 127, 135, 63 A. 2d 635, 639.

The expression "substantial part" is not a term of mathematical precision. A "substantial part of the activities and work" of an organization is a considerable part. For illustration, in construing the rule that an employee is covered by the Fair Labor Standards Act when a substantial part of his activities relates to goods moving in interstate commerce, Judge Rifkind observed that the term "substantial part" simply means the converse of insubstantial or immaterial. *Berry v. 34 Irving Place Corporation*, 52 F. Supp. 875, 879.

The Linguistic Society of America was organized in 1925 as an unincorporated association. It was incorporated under the laws of the District of Columbia in 1940. Its purpose is to advance the scientific study of languages.

Most of the members are scholars interested in the study of languages, ancient or modern, in colleges and universities in the United States and foreign countries. In 1948 the society had 748 members, 17 of whom had Maryland addresses, and also 294 subscribing libraries, 4 of which were located in Maryland. Prior to 1947 the society had about $16,000 in its treasury. In 1947 it received $20,000 from the sale of the Collitz Library to the Johns Hopkins University.

Appellant urged that only 2 per cent of the members of the society were residents of the State of Maryland, and that the society did not show that it had ever held a meeting in this State. But we must remember that the Linguistic Society does not undertake, like such organizations as the American Red Cross and the Salvation Army, to engage in welfare or relief work. Its work is literary and esoteric. The society holds only one meeting a year and the attendance at the annual meeting is small. The society's chief medium for the advancement of the study of languages is its publications. The principal publication is the quarterly magazine called "Language." The society issues an annual bulletin containing the proceedings of the annual meeting, reports of committees, the annual financial statement, and the list of members. The society also issues two occasional publications: (1) "Language Monographs," containing studies too long to appear as articles in the magazine, and (2) "Language Dissertations," containing theses for the degree of Doctor of Philosophy. The society has also issued "Special Publications" from time to time.

There can be no doubt whatever that the society's principal activities and work have been the issuance of the quarterly magazine and other publications. Appellant contends that the only real activity of the society is the editing of these publications, and he points out that ever since 1944 Dr. Bernard Bloch, of Yale University, chairman of the Committee on Publications, has been the society's editor, and that he has been doing the editorial work in New Haven, Connecticut. Ap-

pellant contends that the printing of the publications has not been done by the society itself, but has been done under contractual arrangements with the Waverly Press, a separate corporation, and that the work of that corporation cannot be considered as an activity of the society. He further argues that the society has no office and no resident agent in Maryland, and that the society does not "do business" in this State merely because its publishing work is done by the Waverly Press.

It is settled law that the mere solicitation of business in Maryland by an agent of a foreign corporation, without other substantial activities within the State, does not constitute "doing business" in the State within the meaning of the Foreign Corporation Law, so as to subject itself to the State forum. Code Supp. 1947, art. 23, sec. 119; *M. J. Grove Lime Co. v. Wolfenden,* 171 Md. 299, 303, 188 A. 794. But we cannot compare the cases under that statute with the case now before us. We are now called upon to determine whether a substantial part of the activities and work of the Linguistic Society has been carried on in this State. It is conceded that all of the society's publications have been printed for more than a quarter of a century in Baltimore. The Waverly Press has special stocks of type for various languages, and hence the society has employed that Press for the printing of all of its publications. The Press has been the agent of the society for printing, publishing and mailing. However, all of the publications are actually published by the society itself. Thus, on the cover of every copy of the magazine are printed the words: "Published by the Linguistic Society of America at the Waverly Press, Inc., Mount Royal and Guilford Avenues, Baltimore, Md." The largest disbursements from the society's treasury have been to the Waverly Press for the printing of its publications. In 1948, for instance, the society paid for that purpose about $8,500, which was about three-fourths of the total expenditures for that year.

Appellant finally contends that the printing of the publications cannot be considered as "the activities and work" of the society. He contends that the Legislature, in writing the words "a substantial part or all of the activities and work," actually meant "a substantial part or all of the activities and charitable and beneficial work." But we cannot read the suggested words into the statute.

Inasmuch as a substantial part of the activities and work of the society has been carried on in the State of Maryland, the decree of the chancellor must be affirmed.

*Decree affirmed, with costs.*