Gerald **EINAUGLER, M.D.,** Petitioner,

v.

**SUPREME COURT OF the STATE OF NEW YORK FOR the COUNTY OF KINGS, the Honorable Neil J. Firetog, and Edward Kuriansky, Respondents,**

and

Dennis C. Vacco, Attorney General of the State of New York, Additional Respondent.

No. 95 CV 1051.

United States District Court, E.D. New York.

March 8, 1996.

Peter A. Chavkin, Stillman, Friedman & Shaw, New York City, for petitioner.

Donald H. Zuckerman, State of N.Y., Dept. of Law, Medicaid Fraud Control Unit, New York City, for respondents.

## MEMORANDUM AND ORDER

KORMAN, District Judge.

Alida Lamour died on May 24, 1990, at the age of seventy-eight. The primary cause of death, as determined by the medical examiner, was "chemical peritonitis following infusion of liquid feeding supplement through [a] peritoneal dialysis catheter placed for treatment of renal failure due to essential hypertension." Tr. 589–90. Other "contributory factors to the cause of death" were "arteriosclerotic cardiovascular disease ... commonly known as hardening of the arteries" and diabetes mellitus. Tr. 590.

Six days before she died, Ms. Lamour had been transferred from Interfaith Hospital, where she had been treated for end-stage renal disease, to the JHMCB Nursing Home located across the street. End-stage renal disease "means that the kidneys stop functioning [permanently] and you need dialysis." Tr. 487. "In dialysis the functions of the kidneys, which include removing waste products from the body and regulating the chemical and water balance, are taken over by a machine." American Medical Ass'n, *Family Medical Guide* 551 (Charles B. Clayman ed., 3d ed. 1994).

There are two forms of dialysis. One, hemodialysis, filters waste products from the blood. "To do this, blood from an arm or leg artery is passed along a thin tube to the [hemodialysis] machine, through its filter (called an artificial kidney), and back along another tube into an adjacent vein. A standard treatment, which lasts four hours and is repeated two or three times a week, is enough to control levels of waste products and excess water" in the body. *Id.*

Until a few weeks before her death, Ms. Lamour had been receiving hemodialysis treatment at Interfaith Hospital while a resident at the JHMCB Nursing Home. Ultimately, her cardiovascular system could no longer tolerate this form of dialysis. "This was a debilitated elderly lady who had some heart failure and her level of [blood] pressure was not very great and it would not keep the vessels open so we could not continue hemodialysis in the normal way and consequently we switched her over to peritoneal dialysis." Tr. 199.

The switch to peritoneal dialysis involved the permanent placement of a thin plastic tube, known as a Tenchkoff catheter, in a cavity inside the abdomen called the peritoneal space (the space between the inner and outer layers of the sac lining the abdominal walls). Tr. 488. "A special fluid flows slowly though the tube and fills the peritoneal space. Waste products seep from the blood vessels that line the abdomen into the fluid, which is then drained out along with water. This process takes several hours." *Family Medical Guide, supra,* at 551. While some patients perform this procedure for themselves, Ms. Lamour was unable to do so. The plan of treatment was to transfer her from Interfaith, where the catheter had been inserted, back to the nursing home, and to move her periodically back to Interfaith for the dialysis procedure. Tr. 206.

Ms. Lamour was the first peritoneal dialysis patient ever to be a resident at the JHMCB Nursing Home. When she was admitted, the nursing home had no protocols in place for the care of such a resident, and the staff was not trained in the "care of the peritoneal dialysis tube, and how the nurse should change the dressing and a whole list of things to be done...." Tr. 419–20. The transfer to a nursing home that was "not equipped to deal" with her was the beginning of the end of Ms. Lamour's life.

When she returned to the nursing home on Friday, May 18, 1990, Ms. Lamour was seen by Dr. Gerald Einaugler, who was an attending physician there and who would ultimately be held criminally responsible for her death. Dr. Einaugler observed the peritoneal dialysis tube in Ms. Lamour's abdomen. Unfortunately, he mistook it for a gastrointestinal

feeding tube and issued orders for Ms. Lamour to be given Isocal, a feeding solution, via that tube.

Dr. Einaugler would testify at his trial to several circumstances that influenced his appraisal of the situation. A Tenchkoff catheter, with which he had no experience, is similar in appearance to a kind of tube used for feeding known as a PEG, with which he was more familiar. Tr. 824–25. The placement of the tube was consistent with prudent placement of a feeding tube so as to avoid scar tissue. Tr. 52, 840–41. Although the patient's transfer form indicated that the patient had a Tenchkoff catheter, it also said "Tenchkoff catheter placed for IPD," and "intermittent peritoneal dialysis," which led Dr. Einaugler to believe that the patient was being treated with a form of intermittent dialysis in which a new tube is inserted and removed each time the procedure is done. Tr. 837–38. In addition, the form did not indicate that the patient, who required a special diet, was to be fed by mouth rather than by tube. Tr. 838–39.

Dr. Einaugler's negligent error was compounded by a staff that was not trained in caring for patients with end-stage renal disease. Thus, the effort to carry out Dr. Einaugler's order continued even after the first nurse who attempted to comply with it was unable to connect the feeding apparatus to the patient's tube because the openings were not compatible. With the assistance of another nurse and a supervisor a plastic cap was removed from the dialysis tube to make it compatible with the feeding tube and the feeding commenced on Friday evening. Tr. 1297–99.

Although the feeding of Alida Lamour proceeded at regular intervals over the weekend, it was not until approximately 5:30 a.m. on Sunday morning, May 20, 1990, that a nurse noticed that the patient was having difficulty breathing, her abdomen was distended, and she had previously vomited. Tr. 47–49, 295. The nurse realized what had happened and notified her supervisor. The nurses then drained about 2,000 cc's of feeding solution from the catheter by rolling the patient over and rocking her back and forth. At that point, the breathing difficulty subsided, Ms. Lamour's vital signs were normal, and she rested quietly. Tr. 50.

At approximately 6 a.m., the nurse supervisor notified Dr. Einaugler of his mistake and described Ms. Lamour's condition. Dr. Einaugler then called Dr. Dunn, who was the Chief of Nephrology at Interfaith Hospital and who had treated Ms. Lamour during her last stay. Dr. Einaugler testified that he "told Dr. Dunn that I had inadvertently ordered to feed tubing through a catheter that was in essence a peritoneal catheter. I misjudged it for a PEG. I told him the nurses had fed the patient but they told me that they had drained out most of the fluid, the patient was stable, she had no peritoneal abdominal signs and did not seem to be in any distress." Tr. 844–45. According to Dr. Einaugler, Dr. Dunn told him "don't get panicky. Don't worry, it doesn't seem like any emergency the way you are describing it to me. If she's stable, send her to the hospital on Monday, and then we can evaluate her for dialysis and lavage." Tr. 845.

After his telephone conversation with Dr. Dunn, Dr. Einaugler testified that he went to the nursing home to examine the patient. She was stable and showed no early signs of an adverse reaction. Tr. 846. Dr. Einaugler testified that he called Dr. Dunn after examining Ms. Lamour and "told him my findings ... she seems to be in no distress, bowel sounds are present, there is no fluid percussion that I can feel." Tr. 846. Dr. Dunn, according to Dr. Einaugler, "reiterated in essence again that that's good, it seems that everything is stable, doesn't seem to be a problem at this time, and we can send the patient out on Monday for lavage and dialysis." Tr. 846. Dr. Einaugler testified that he told Charlene Lowe, a nurse who was the evening supervisor at the nursing home, to "document in the chart that I spoke to Dr. Dunn and this is what he told me, that it doesn't seem to appear to him, the way we have described it, as an emergency situation, and that on the following day, transportation to the hospital and evaluation for lavage and dialysis would be done." Tr. 845.

While Nurse Lowe confirmed this conversation with Dr. Einaugler, Tr. 54, Dr. Dunn flatly contradicted Dr. Einaugler. Dr. Dunn

testified that, after hearing the description of the patient's condition, he said, "well let's get the patient into the hospital" and that Dr. Einaugler "indicated that he would do exactly that." Tr. 201. On redirect, he again testified that he "directed ... Dr. Einaugler to have the patient admitted, period." Tr. 241. Dr. Dunn did not testify that he told Dr. Einaugler what he meant by this instruction, but did testify that he "meant it should be done in urgent fashion, which would probably be that day." Tr. 241–42.

Sometime between 11 a.m. and 2 p.m., Dr. Einaugler notified Dr. Khaski, the supervising physician at the nursing home, about the feeding tube mistake. Tr. 404–05. The substance of this conversation was likewise the subject of conflicting testimony. Dr. Einaugler and Dr. Khaski both agree that during this conversation petitioner told Dr. Khaski that Dr. Dunn had said that "it was not an emergency, and the patient can be kept there [at the nursing home], and for the following day on Monday." Tr. 396, 851. Contrary to Dr. Einaugler's account, Dr. Khaski further testified that he disagreed with the evaluation and urged that the patient be hospitalized:

> I told Dr. Einaugler that the patient should be transferred to the hospital. I do not agree with Dr. Dunn. It's an unusual occurrence, you know, mistake was done and she should be treated in the hospital and not in the nursing home.

Tr. 396.

Dr. Einaugler testified that he checked the patient again in the early afternoon and that she was still stable. Tr. 851–52. At approximately 4:30 p.m. he received a call from a nurse advising him that Ms. Lamour was "less responsive," "looked weak," and was not tolerating food by mouth. Tr. 251, 852–53. The nurse's contemporaneous note recorded that Ms. Lamour was "unresponsive" to verbal stimuli, looked "pale and ill," but did not have a fever. Tr. 252. Dr. Einaugler then ordered Ms. Lamour transferred to Interfaith Hospital. *Id.*

Shortly after Ms. Lamour arrived at Interfaith, Dr. Dunn began monitoring her condition by telephone. Dr. Dunn testified that although Ms. Lamour entered the hospital

through the emergency room, he believed she was "admitted immediately up to a bed on a floor." Tr. 207. He further testified that he had explained to the house staff "what should be done that day and what would be done the next day" and, he continued, "I was content that there was no necessity for me going into the hospital." Tr. 207.

The treatment Ms. Lamour required after being admitted to the hospital was a continued effort to remove any remaining Isocal from her peritoneum, Tr. 204, and "antibiotic coverage" to prevent the onset of bacterial peritonitis, which would almost inevitably develop from the bacteria in the Isocal. Tr. 209. Although a substantial amount of Isocal had been drained by the staff at the nursing home earlier that day, it was unlikely that all of it had been removed from the peritoneal cavity. The procedure used to remove the remaining Isocal is known as lavage, Tr. 204, a process by which a sterile solution is inserted into the peritoneum and then removed. The process is repeated continuously without allowing the solution to remain in the peritoneum for any extended period of time. "Initially you would not want to have too much of a dwell time because you're interested in getting out particular matter. You're not interested in letting the solution stay there to do the periton[eal] dialysis which would ordinarily be done" by a similar process. Tr. 231.

Although Ms. Lamour was admitted to the hospital at about 5 p.m. on Sunday, it does not appear that she received the critical treatment that she should have received until sometime the next day. Dr. Dunn did not know when lavage was begun. Tr. 228. There was a note in the Interfaith Emergency Room admission records, People's Ex. 1–21, indicating that the plan for the management of the patient included "peritoneal lavage" and another note under it, in parentheses, indicating that this was "done." Dr. Michael Baden, the only witness asked to interpret this record testified that it was "not possible to say from this entry that it was done the same day the patient came in, and my impression from all of the records is that the lavage was done the next day." Tr. 1189. The only other evidence indicating the times

that treatment was administered came from Dr. Robert Feingold, an expert prosecution witness, who testified that hospital records, People's Exs. 1–32 and 1–90, indicated that lavage was started at 9 a.m. on Monday and that antibiotics were first administered at one o'clock on Monday, although he could not decipher whether it was a.m. or p.m. Tr. 508.

The consequences, if any, of the delay in treating Ms. Lamour for peritonitis were not immediately apparent. When Dr. Dunn visited Ms. Lamour for the first time on Monday morning, she was in the same condition that Dr. Einaugler had described to him on Sunday morning. Tr. 239. "She looked pretty good and was very benign and was not running a temperature. The belly was very soft and benign." Tr. 235. Ms. Lamour's condition was, "[u]nbelievable, but wonderful." *Id.* Nevertheless, she died four days later.

A grand jury investigation of the circumstances leading to her death resulted in an indictment charging petitioner with reckless endangerment in the second degree in violation of Penal Law § 120.20 and of willful patient neglect in violation of Public Health Law § 12-b. The indictment reads as follows:

### Count One

[T]he defendant, Gerald Einaugler, from on or about May 18, 1990, to on or about May 20, 1990 ... recklessly engaged in conduct which created a substantial risk of serious physical injury to another person in that the defendant, an attending physician ... on May 18, 1990 ordered and directed that Alida Lamour, a patient under his care at this nursing home, be administered a feeding solution through an existing peritoneal dialysis catheter. Early in the morning of May 20 of 1990, the defendant became aware that the patient required immediate hospitalization to treat the effects of the introduction of the feeding solution to the peritoneum. The defendant did not order such hospitalization until late in the afternoon of that day, thereby creating a substantial risk of serious physical injury to Alida Lamour.

### Count Two

[T]he defendant, Gerald Einaugler ... willfully violated Section 2803–d, subdivision 7 of the Public Health Law, Part 81 of the regulations promulgated by the Commissioner of Health therein, that the defendant, a licensed physician, while acting as an attending physician ... neglected Alida Lamour, a patient at the nursing home by ordering that the patient be administered a feeding solution through the peritoneal dialysis tube and that after having become aware of that error, and of the necessity for immediate hospitalization in order to rectify that error, he knowingly failed to do so.

After a jury trial, Dr. Einaugler was convicted of both charges and sentenced to incarceration for fifty-two weekends. The Appellate Division affirmed his conviction, *People v. Einaugler*, 208 A.D.2d 946, 618 N.Y.S.2d 414 (App.Div. 2d Dep't 1994), and Judge Simons denied his application for leave to appeal, 623 N.Y.S.2d 187, 647 N.E.2d 459, 84 N.Y.2d 1031 (1995). Dr. Einaugler now petitions for a writ of habeas corpus. The principal claims raised by petitioner are that his convictions on the two counts are not supported by sufficient evidence and that he was denied a fair trial because of the admission of evidence that Ms. Lamour died of chemical peritonitis following the infusion of Isocal through the peritoneal dialysis catheter.

### Discussion

This is a sad case. Alida Lamour was the victim of multiple acts of medical malpractice. She was returned to the JHMCB Nursing Home where the staff was not trained to care for her. A chemical irritant was mistakenly fed into her peritoneal dialysis catheter; it took a day and one-half before the mistake was noticed; she was not immediately transferred to Interfaith Hospital for treatment that would have addressed the potentially life threatening effects of chemical peritonitis which she contracted as a result of being fed through the catheter; and, when she was finally admitted to Interfaith Hospital, she may not have immediately

received the treatment that she should have been given.

The only person held accountable in any way for this neglect is petitioner. The distinction between the conduct that formed the basis for the indictment and the other acts of neglect is that petitioner is alleged to have deliberately failed to take steps that he knew he should have taken. The linchpin of both counts is not the careless error that caused the patient to be fed Isocal through the dialysis catheter. This error, however horrifying and incompetent, was a mistake from ignorance, not a mistake made with any apparent criminal intent. Instead, the criminal conduct alleged in the indictment was petitioner's failure to hospitalize the patient after he became aware that it was necessary "to treat the effect of the introduction of the feeding solution to the peritoneum," (Count One) and to "rectify the error" (Count Two).

While each of the two charges contains different elements, the one element they have in common is, under different formulations, that the defendant consciously deviated from what he knew to be the appropriate standard of care. Accordingly, before proceeding to discuss separately petitioner's challenge to the sufficiency of the evidence as to Counts One and Two, it is necessary to address this common element.

The evidence was undisputed that Ms. Lamour required hospitalization in the early morning hours of May 20, 1990, when petitioner first learned that she had been fed through the peritoneal dialysis catheter. Doctor Dunn and Dr. Feingold, the prosecution's key expert, as well as the defense's two expert witnesses, all testified that they would not have delayed transferring the patient to the hospital. The physicians for the defense stated they would have begun treatment immediately even though the patient was experiencing at most a "mild" case of peritonitis on Sunday. Tr. 1049, 1091, 1314, 1358. Dr. Feingold stated that, even if her condition did not appear serious, a severe reaction could develop later. Dr. Feingold called this the "calm before the storm." Tr. 495. Although Dr. Dunn stated that, based on the patient's condition on Sunday, "I would not think that there was an emergency situation at that moment in time, that her life was in danger momentarily," Tr. 238, and that "even on Monday morning ... she was not in immediate danger of dying," Tr. 239, he also testified that he would not have delayed transferring her to the emergency room.

There was also sufficient evidence, if credited by the jury, to establish that petitioner knew of the need for prompt hospitalization. Petitioner testified that he did not exercise any independent judgment in determining how to treat Ms. Lamour. Instead, he followed the advice of Dr. Dunn:

> So basically, by calling Dr. Dunn, if he would have given me an input, look send the patient down that day, or write orders for certain dialysate, what has to be done, I would have followed the instructions, but he did not give me orders for that. He basically said the patient appeared stable and this could be managed on Monday, and his expertise and knowledge of the patient; and I have never handled this type of problem before. I relied on his expertise.

Tr. 849. In response to a direct question from his attorney, petitioner reiterated that, if Dr. Dunn had told him that Alida Lamour "should have been transferred to the hospital immediately," he would have done so "because I was relying on his expertise. It was a new situation which I had never encountered." Tr. 849–50.

Dr. Dunn, however, flatly contradicted petitioner's version of his conversation with petitioner. Dr. Dunn testified that, when he spoke to petitioner on Sunday morning, he told petitioner to hospitalize Ms. Lamour and he denied saying that her hospitalization could be delayed until Monday. Dr. Khaski, with whom petitioner spoke in the early afternoon, testified that he explicitly told petitioner that Ms. Lamour's hospitalization could not be delayed until Monday. Their testimony, as Dr. Einaugler acknowledged, was not consistent with his:

> Q. And did you hear Dr. Dunn say in words or substance that he told you to send the patient to the hospital?
>
> A. Yes, I did.
>
> Q. Is it fair to say you take issue with Dr. Dunn's testimony?

A. Yes, I do.

. . . .

Q. And did you hear Dr. Khaski testify, in words and substance, that he directed you to send the patient to the hospital?

A. Yes, I do [sic].

Q. And is it fair to say that you take issue with Dr. Khaski's testimony that he directed you, as your medical supervisor, to send the patient to the hospital?

A. Yes.

Tr. 866–68.

Petitioner's testimony was also contradicted by a note that he acknowledged making on Ms. Lamour's chart on Sunday, May 20, 1990. The note reads, "Spoke to Doctor Dunn, (Renal). Told to send patient over for evaluation to IMC [Interfaith] ER [Emergency Room]." People's Ex. 2–13; Tr. 211, 926–27. Dr. Dunn testified that this note accurately summarized the conversation in which he "directed Dr. Einaugler to send Alida Lamour to the hospital that Sunday morning." Tr. 211. According to Dr. Einaugler, however, the note was written after Ms. Lamour had been admitted to the emergency room at Interfaith. Its language, which suggests otherwise, "was grammatically incorrect." Tr. 927. As Dr. Einaugler explained:

> Basically, after the patient was in the emergency room, I went back right across the street to the nursing home from the hospital and just wrote a quick one line note, and I basically meant to say that Doctor Dunn was notified patient was going to the ER, but I grammatically didn't do it the right way, and I stated that, and apologized for my grammar in the Grand Jury testimony, and that's when this note was written.

Tr. 928. Because it is likely that petitioner would have called Dr. Dunn after he was advised that Ms. Lamour's condition deteriorated on Sunday afternoon, petitioner's explanation is not implausible. Nevertheless, the jury was not required to accept this explanation any more that it was required to reject the testimony of Dr. Dunn and Dr. Khaski.

Nor is there any merit to petitioner's claim that the evidence was insufficient because

Dr. Dunn did not testify that he told petitioner *in haec verba* that Ms. Lamour should be hospitalized immediately. The jury could conclude from the circumstances that, absent any express direction to the contrary, Dr. Dunn's direction to hospitalize Ms. Lamour meant immediately. Indeed, petitioner's defense at trial was not that he misunderstood Dr. Dunn. Instead, he testified that Dr. Dunn explicitly told him that hospitalization could be delayed until the next day.

While it is difficult to understand why petitioner would seek the advice of Dr. Dunn and Dr. Khaski and then ignore it, and while both Dr. Dunn and Dr. Khaski, like petitioner, may have had a motive to lie, this is a classic case in which deference must be accorded to the jury's resolution of the credibility issue. The jury found that Dr. Einaugler had been advised to hospitalize Ms. Lamour on Sunday morning and that he did not do so. This finding is sufficient to satisfy the element of conscious neglect as it is formulated under either Count One or Count Two, because, whether or not he hastened her death, petitioner consciously failed to do what every physician testified he should have done: transfer her immediately to the hospital for aggressive treatment. This conclusion leaves nothing to petitioner's challenge to the sufficiency of the evidence on the charge of patient neglect alleged in Count Two of the indictment. The only other element of patient neglect under § 12–b(2) is that the defendant knew that neglecting a patient was illegal. *See People v. Coe*, 71 N.Y.2d 852, 855, 527 N.Y.S.2d 741, 743, 522 N.E.2d 1039, 1041 (1988). Petitioner stipulated to this at trial. Tr. 684.

■ The reckless endangerment charge contained in Count One alleged a more aggravated form of negligence, requiring additional proof that the delay in hospitalizing Ms. Lamour created a "substantial risk" of "serious physical injury" and that the defendant was aware of such risk. The crime of reckless endangerment must be understood in the context of other related crimes provided for in the New York Penal Law:

> Reckless endangerment is the lowest of three levels of crimes prohibiting reckless conduct. The statutes defining it seek to

prevent the risk created by the actor's conduct, not a particular outcome. Thus unlike reckless conduct which produces death (depraved mind murder; manslaughter) or physical injury (assault), no injury results from reckless endangerment. *The risk of injury alone sustains prosecution.*

*People v. Davis,* 72 N.Y.2d 32, 36, 530 N.Y.S.2d 529, 530–31, 526 N.E.2d 20, 21–22 (1988) (emphasis added). The Penal Law further provides for two degrees of reckless endangerment corresponding to two levels of risk. Conduct that creates a "grave risk of death" is the higher level and is an element of reckless endangerment in the first degree, which also requires that the circumstances "evinc[e] a depraved indifference to the value of human life." N.Y.Penal Law § 120.25 (McKinney 1987). "Substantial risk" of "serious physical injury" defines the lower level and is an element of reckless endangerment in the second degree. "Serious physical injury" is as an injury "which creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health, or protracted loss or impairment of the function of any bodily organ." N.Y.Penal Law § 10.00(10).

■ Determining whether there is sufficient proof of risk of injury to sustain a conviction for reckless endangerment in the second degree, therefore, requires an inquiry into the "degree of risk presented by defendant's reckless conduct." *Davis,* 72 N.Y.2d at 36, 530 N.Y.S.2d at 531 (quoting *People v. Register,* 60 N.Y.2d 270, 277, 469 N.Y.S.2d 599, 602, 457 N.E.2d 704, 707 (1983)). The actual injury suffered is relevant only to the extent that it provides a basis for inferring that, at the time the defendant acted, the defendant's conduct necessarily created a substantial risk that the injury would take place.

What makes this a troubling case is that none of the witnesses called by the prosecution testified directly that the delay created even a risk of death, much less a quantifiable risk of death, and that a lay jury in a criminal case was forced to deduce this critical element of the offense from circumstantial evidence. Even in civil medical malpractice cases, New York law recognizes that the intricacies of medical practice are beyond the competence of the ordinary lay person and that without expert assistance, jurors cannot reliably evaluate the contentions of the parties. Such testimony is especially important on the difficult issue of causation:

[E]ven where negligence is easily within the layman's realm of knowledge and hence properly provable without expert testimony, expert testimony may be required to prove that the negligence was the proximate cause of the injury complained of, for "[a]lmost every person who receives the services of a physician is sick or disabled when he first goes to the physician. Thus there lurks the ever present possibility that it was the patient's original affliction rather than the physician's negligence which caused the ultimate damage." (1 Louisell and Williams, *Medical Malpractice,* par 8.07, p 213.).

*Sitts v. United States,* 811 F.2d 736, 740 (2d Cir.1987). The causation question is made even more complicated where, although the patient suffers actual injury, liability is attached to conduct that allegedly "caused" risk of injury, rather than actual injury. In such circumstances, a lay juror, without the assistance of an expert, might not even be able to isolate the relevant risk of injury, much less evaluate its substantiality. Nevertheless, there was no such testimony here.

The only prosecution witness who was even asked a direct question relating to the risk of delay in treatment was Dr. Robert Feingold. His answer directly addresses only the need for prompt treatment to avoid the consequences of chemical peritonitis, which can come on "quickly," Tr. 499, but he did not testify that any of those consequences could cause death. Nor did he testify that the failure to afford prompt treatment to a patient in Ms. Lamour's condition created a risk of death.

Dr. Feingold's testimony, along with similar testimony by other witnesses, established that the purpose of such treatment was to alleviate the consequences of chemical peritonitis *before* they manifested themselves and to ameliorate them as soon as possible if they had manifested themselves. The most seri-

ous of these consequences was the loss of fluid from the blood stream into the peritoneal cavity, which can cause the patient to become quickly dehydrated and go into shock. Tr. 493. Shock "is a condition in which the flow of blood throughout the body suddenly becomes inadequate, and vital parts, deprived of oxygen, drastically reduce function, at best briefly." If "shock develops, your body enters a dangerous downward spiral. Lack of blood flowing to the brain deprives it of oxygen. As the brain is affected the blood vessels become over dilated and unresponsive because the nervous system cannot control blood vessel diameter as it normally does. In a spiral of events, the blood pressure then drops even further because your blood vessels are enlarged. Once caught in this downward spiral, your body cannot recover without medical intervention." American Medical Association, *Family Medical Guide, supra,* at 414–15.

There is no evidence here that Ms. Lamour was in shock when Dr. Einaugler was first advised that Isocal—the chemical irritant capable of causing chemical peritonitis—had entered her peritoneal cavity. The "downward spiral" that can be fatal if not treated had not yet begun. Although Dr. Feingold alludes to the risk of "shock," he never defined shock, nor did he describe for the jury the consequences of shock. The description of shock and its effect on the body, which appears here, is *not* from the trial transcript. Instead, it is taken from the American Medical Association's *Family Medical Guide.* Moreover, Dr. Dunn's testimony, at the very least, provided a basis for inferring that the delay at issue here did *not* create a substantial risk of death. Dr. Dunn testified that, had he been the doctor responsible for the patient at that time, he would have ordered the transfer immediately, but "[i]f it took ten or 11 hours, I would not tear my hair out and rant and rave. So be it. I felt it was in the realm of the window that I had to work with." Tr. 243.

Nor does Dr. Feingold's testimony regarding the administration of antibiotics suffice to establish a substantial risk of death. Dr. Feingold testified that, notwithstanding the symptoms of chemical peritonitis, antibiotic treatment for bacterial peritonitis should have been administered because it usually takes forty-eight hours to obtain the results of a culture to determine whether bacteria are present. Under these circumstances, the wisest course of action is not to await the test results before beginning treatment. Tr. 498–99. Nevertheless, even if Ms. Lamour had bacterial peritonitis, there is no evidence that the delay in any way would have hindered the treatment of infection if it were to have developed prior to the administration of antibiotics. Nor was there evidence that, if a bacterial infection had developed, it would have been life-threatening. Indeed, Dr. Feingold testified that most patients who develop bacterial peritonitis and are then treated with antibiotics recover and that, "in retrospect, the antibiotics may not have been necessary [here]." Tr. 545.

There is testimony, however, which details the effects of fluid loss on the cardiovascular system. Dr. Jonathan Arden, the pathologist who concluded that Ms. Lamour's death was caused by chemical peritonitis, testified that, when death results from peritonitis, it is not irritation of the peritoneum, but the effects of peritonitis on the body, that can "actually kill you." Tr. 613. One of the effects of peritonitis is on the cardiovascular system. "Chemical peritonitis has an affect [sic] on the circulatory functions of the body, fluids are excreted into the peritoneal cavity as a result of the inflammation, thereby in essence robbing the blood stream of fluids and placing a strain on the cardiovascular system in general." Tr. 617–18.

Moreover, Dr. Arden continued, whether chemical peritonitis is fatal depends on the "severity" of the peritonitis and "upon the person who had peritonitis":

> You or I might be able to withstand to a degree of a type of peritonitis much more readily than somebody who has other underlying medical conditions and is more prone to succumb.

Tr. 613–14. The following colloquy then ensued:

> Q. What bodily function was affected by peritonitis which in turn brought about [Ms. Lamour's] death?

A. The one bodily function that I already mentioned concerns the affect [sic] of peritonitis on the cardiovascular system. In particular the fact that peritonitis will cause fluid to exude, if you will, into the peritoneal cavity from the blood stream which will be a strain on the cardiovascular system.

Tr. 621.

Dr. Steven Blau, a defense witness, testified in a similar vein. He stated that "[w]hat happens, there is irritation ... and the fluid moves out into the abdominal cavity ... to neutralize it, to dilute it out, and that fluid comes from the intravascular space. So, the patient would frequently be cold and clammy and can shocky [sic], very decreased blood pressure or decreased pressure of the heart." Tr. 1346.

Dr. Arden's testimony, as corroborated by Dr. Blau, provided a basis for the jury to understand the need for immediate treatment. Other witnesses explained that Ms. Lamour required lavage to remove the remaining Isocal, which otherwise would continue to draw fluid from the blood stream into the peritoneal cavity, and intravenous injection of fluid to make up for any fluid loss. Dr. Feingold testified that this loss can occur quickly, thereby causing "shock," which he never defined. Dr. Arden, however, provided a basis for the jury to conclude that this is an event that causes strain on the cardiovascular system, which can be fatal to "somebody who has other underlying medical conditions." Tr. 614.

Ms. Lamour was suffering from significant cardiovascular disease among other degenerative conditions. "She had heart failure, she had organic mental changes, which means there were changes in her brain and she wasn't functioning properly. She wasn't talking properly and she had heart failure and she had poor cardiac output. Blood pressures were on the low side and it was—this is why she couldn't be maintained on hemodialysis. The vessels keep failing and she was a very, very debilitated patient." Tr. 216–17. This testimony provided a basis for inferring that Ms. Lamour's life was placed at substantial risk by petitioner's failure to take measures to avoid placing further strain on her already debilitated cardiovascular system.

Moreover, it is not altogether without significance that Dr. Einaugler and each of the defense witnesses had difficulty giving clear and direct answers to the question of whether the delay in hospitalizing Ms. Lamour carried with it a substantial risk of death. Dr. Einaugler testified, "I did not believe there would be any risk [of death] to the patient *at that time*, since I discussed it with one expert and he knew the patient." Tr. 850 (emphasis added). On cross-examination, the following colloquy ensued:

Q. Is it accurate to say, Doctor, that the—that you did not order the hospitalization of Alida Lamour until the late afternoon of May 20?

A. Yes.

Q. And that thereby, Doctor, you created a substantial risk of serious physical injury to Alida Lamour?

. A. Not according to Doctor Dunn's testimony.

Q. I am not asking you about Doctor Dunn's testimony.

Tr. 9932. After a series of objections and some indication by Dr. Einaugler that he was "not sure how to answer that question," Tr. 933, the following colloquy ensued:

Q. Doctor, just so I am clear, it's your testimony that you can't answer whether or not your failure to order hospitalization for Alida Lamour until late in the day on May 20, created a substantial risk of serious physical injury to that patient, your response to that question, was, that you can't answer that question?

A. That particular substance I do not think it was in [sic] substantial risk to her health.

Tr. 933–34. At best, this answer demonstrates a reluctance to address the issue. It also suggests an inference that a delay in hospitalization could create a substantial risk for Ms. Lamour and that Dr. Einaugler knew it. The jury was not required to credit his suggestion, as it relates either to his state of mind or to the medical facts, that Isocal, contrary to all of the other testimony, was

not an irritant capable of producing chemical peritonitis.[1]

The expert witnesses called by petitioner to challenge the claim that Ms. Lamour died from the effects of chemical peritonitis also sought to avoid directly confronting the issue of the potential risk to Ms. Lamour in delaying treatment. Dr. William Lois was unable initially to answer the question of the potential risk from the delay in hospitalization because he had not "seen any of the charts from the nursing home. I don't know exactly what has happened at that time frame. It's a situation that is really—clinical, what we call a clinical call." Tr. 1077. Nevertheless, "[i]n retrospect," looking at what actually occurred after Ms. Lamour was hospitalized, Dr. Lois testified that the "delay itself didn't seem to change the outcome at all." Tr. 1077. Later, on redirect, the following colloquy took place:

> The Court: As a result of the patient being admitted at the time she was, given the time the feeding solution was discovered in her peritoneum, did that delay in admitting her, cause a substantial risk that serious physical injury or death could result because of the possibility of peritonitis?
>
> The Witness: According to the chart, no.
>
> The Court: According to your opinion.
>
> The Witness: According to the opinion, no.

Tr. 1080–81.

Dr. Blau, who testified that Ms. Lamour "had a very mild chemical peritonitis," Tr. 1314, was asked whether the delay in treating Ms. Lamour would "have created a substantial risk of death for this particular patient from chemical peritonitis." Tr. 1316. Dr. Blau responded that he did not "see the delay as being a cause of death by chemical peritonitis in this patient." Tr. 1317. Outside the presence of the jury, he explained that, "I am not convinced from this chart review that the patient died secondary to peritonitis, and therefore, I am not convinced that the delay in transferring the patient . . .

contributes to the death." Tr. 1329. Later, in the presence of the jury, he was asked "whether or not that [delay] posed a substantial risk of serious physical injury or death to this particular person," Dr. Blau responded, "I don't see that to [sic] contributing to increased risk to this patient." Tr. 1353–54.

The critical question in this case, as it related to Count One, was not whether Ms. Lamour died from chemical peritonitis, or even whether the delay actually caused her death. The issue was the *risk* to her created by petitioner's failure to hospitalize her for ten hours. *See Davis,* 72 N.Y.2d at 36, 530 N.Y.S.2d at 531. The defense witnesses, however, were hesitant in their answers and appeared to frame them in light of their conclusion that Ms. Lamour did not die from chemical peritonitis. In essence, these witnesses told the jury that because Ms. Lamour did not die from chemical peritonitis, they did not find that the failure to treat her peritonitis mattered very much. This contention and the manner in which it was advanced do little to suggest that delaying hospitalization did not create a *risk* of death for Ms. Lamour.

Petitioner, of course, was not required to produce evidence on this issue. Nevertheless, the jury was entitled to consider the answers petitioner elicited from his own witnesses and, while these answers would not be sufficient to sustain a conviction, the jury could draw some inferences from what they fail to convey in the clear and direct manner to be expected if the delay had not posed a substantial risk of death. At the very least, the testimony of the defense witnesses, that immediate hospitalization was the required course of treatment, supported an inference that delay created some risk of death. When taken together with all of the testimony described above, there was sufficient evidence for the jury to conclude that the delay created a substantial risk of death.

---

1. Dr. William Lois, one of petitioner's expert witnesses, testified that Isocal was less toxic than other feeding substances and that, as a consequence, "[t]he patient will not get the same full blown type of peritonitis . . . with that preparation *as quickly* as with another substance." Tr.

1093 (emphasis added). Ms. Lamour had been fed Isocal for 36 hours at the time the mistake was discovered. Dr. Lois testified that treatment, including lavage, should have begun as soon as possible. Tr. 1094, 1096.

To be sure, an expert's testimony directly addressing the nature of the risk created by petitioner would have made this an easier case and the absence of such testimony continues to trouble me. The circumstantial evidence of the risk created that I have summarized above was gleaned only after extensive and careful review of the record, and this evidence was not argued to the jury in the manner in which I have presented it. Nevertheless, although this is a close call, I conclude that there was sufficiently comprehensible evidence for the jury to make a rational assessment of the relevant risk.

Nor is there any basis to take issue with the implicit holding of the Appellate Division that, to the extent the case turns on a construction of New York law, the risk of death petitioner created was "substantial." Whether that risk was substantial depends on how the term is defined. Judge Rifkind observed, albeit in an unrelated context, that the word substantial "is not a phrase of mathematical precision." *Berry v. 34 Irving Place Corp.*, 52 F.Supp. 875, 879 (S.D.N.Y. 1943). Nevertheless, there are guideposts here. Presumably, a "substantial risk" of death is less than a "grave risk" of death, which is an element of a more aggravated crime, but more than the mere exposure to the chance of death, which is not a crime. *Cf. Stewart v. New York City Health and Hosp. Corp.*, 207 A.D.2d 703, 616 N.Y.S.2d 499, 500 (App.Div. 1st Dep't 1994). Where on this spectrum the line should be drawn is a matter for the New York courts to decide. Suffice it to say that the record here was sufficient for the Appellate Division to conclude that the risk of death created by petitioner's conduct was substantial as that term could reasonably be defined.

Yet another chain of facts and inferences, however, is necessary to satisfy the last element of the offense of reckless endangerment, namely that petitioner was actually aware of this risk when he failed to hospitalize his patient. These inferences are substantially more straightforward. Indeed, they are the kind of commonplace inferences, drawn from circumstantial evidence, that are routinely used to establish a defendant's knowledge. Here, the jury was informed that petitioner was a licensed physician, board certified in internal medicine, who had completed an internship and a fellowship in internal medicine and who had developed a practice caring for elderly people. Tr. 816–17, 917. He knew how sick Ms. Lamour was because he examined her on Friday when she was admitted and he read the paperwork that accompanied her transfer. Tr. 822–24. Dr. Einaugler may, in fact, have seen Ms. Lamour as many as forty times over a five month period while she was housed in an area of the nursing home that Dr. Einaugler was covering. Tr. 868.

Moreover, Dr. Einaugler's own testimony suggests that he had knowledge of the relevant risk. He testified that he was familiar with the seriousness and potentially fatal consequences of peritonitis, Tr. 918, and when he explained why he felt he had to telephone Dr. Dunn, Dr. Einaugler demonstrated a level of familiarity with the important physiological processes involved in peritonitis:

> He's basically a nephrologist and expert. He had also taken care of this patient before, knew this patient, and when you are dealing with peritoneal dialysis, each membrane is not the same. The membranes are what is called semipermeable. They will allow certain things to go in, certain things to go out. The more diseased, the less functional they are, they won't allow certain things to go in or out. So you have to make sure, it's called osmolality. It's a big, fancy name. All it means, if you have a concentration on one side, and a dilution on the other, your body gets a bell and says, We got to equalize these guys.

Tr. 847. Indeed, Dr. Einaugler's defense was not that he was unaware of the risk to Ms. Lamour's life of failing to hospitalize her immediately; it was that he was relying on Dr. Dunn's advice:

> Q: Did you or did you not believe that there would be any risk to the patient in following Dr. Dunn's plan?
>
> A: I did not believe there would be any risk to the patient at that time, since I discussed it with an expert and he knew the patient.

Tr. 850. If the jury did not believe petitioner's version of what Dr. Dunn said, and did not believe his unsupported assertion that he believed Isocal for some reason would not cause peritonitis, they could have "assumed the truth of what he denies." See *Dyer v. MacDougall*, 201 F.2d 265, 269 (2d Cir.1952) (Hand, J.). "[A]lthough a court cannot allow a civil action, much less a criminal action, to go to the jury on the basis of this alone," *United States v. Marchand*, 564 F.2d 983, 986 (2d. Cir.1977), *cert. denied*, 434 U.S. 1015, 98 S.Ct. 732, 54 L.Ed.2d 760 (1978), based on all of the evidence, a jury could have concluded that Dr. Einaugler knew that delaying treatment to a patient in Ms. Lamour's poor physical condition created a substantial risk of death.

■ The conclusion that the evidence was sufficient for the jury to find petitioner guilty still leaves for consideration petitioner's argument that "the jury might have been unduly swayed by inflammatory, though relevant, evidence about the crime or victim." Jon O. Newman, *Beyond "Reasonable Doubt"*, 68 N.Y.U.L.Rev. 979, 999 (1993). This argument focuses on the admission of the opinion testimony of Dr. Jonathan Arden, a New York City medical examiner, that petitioner caused the death of Ms. Lamour by mistakenly feeding her the Isocal from which she contracted the chemical peritonitis that killed her.

This opinion was offered although, as charged, petitioner could have been convicted on both counts even if he had not been the person who ordered that Ms. Lamour be fed through the dialysis tube and even if he had not caused Ms. Lamour any physical injury. Nonetheless, the indictment contained the unnecessary allegation that it was petitioner's error that caused the Isocal to be fed through the dialysis catheter and evidence was offered, without objection, to prove it. The evidence was then followed by the opinion of Dr. Arden that, as a consequence, she contracted the chemical peritonitis from which she died.

Arguing that the prosecution was planning to conduct petitioner's trial as if he were charged with homicide, petitioner made a pre-trial motion to preclude the introduction of any evidence that the patient died after she left the petitioner's care. In response, the prosecution argued that the evidence of cause of death was being offered, not to portray uncharged crimes, but to prove the reckless endangerment charge. It argued that the evidence was highly relevant to the nature of the risk created by petitioner and that absent the evidence about what eventually happened to the patient, the jury would be left with what the prosecution characterized as "the very misleading impression that Dr. Einaugler took action to help Alida Lamour, albeit, a little bit late." People's Mem. in Opp'n to Mot. to Preclude Evid. at 6.

The trial judge denied petitioner's motion to exclude the evidence in an off-the-record hearing. See Letter from Zuckerman of 8/25/95. His only explanation on the record was that the evidence of the cause of death was "integral to the case," and that "to grant the motion in limine would cause greater speculation and divert the attention of the jury." Pre–Trial Tr. 18. In its Appellate Division brief, the prosecution implied that the trial judge had imposed "boundaries" on the presentation of cause of death evidence, Resp.Br. at 31. The prosecution was unable, however, to provide details of any "boundaries," when directed to do so by my order dated August 11, 1995. See Letter from Zuckerman of 8/25/95. Nor was it able to respond to a similar request by the Appellate Division, which nevertheless summarily rejected, as being without merit, petitioner's argument that he was unfairly prejudiced by the admission of the cause of death evidence.

I am more troubled by the prosecution's use of the cause of death evidence than were the New York courts. The evidence that Ms. Lamour died from chemical peritonitis arguably supported the inference that the ten-hour delay in hospitalization created a substantial risk of death. Nevertheless, because of circumstances that detracted from the force of the inference, its relevance for this purpose was limited at best. The chemical peritonitis from which death ensued was caused by the administration of a chemical irritant into Ms. Lamour's peritoneal cavity for some thirty-six hours before the error was discovered. Moreover, the evidence sug-

gests that even after she was hospitalized, Ms. Lamour may not have received the necessary treatment in a timely manner. Accordingly, the evidence that Ms. Lamour died of peritonitis shed little light on the significance of the ten-hour delay attributed to Dr. Einaugler, which was sandwiched between two longer periods of delay. Indeed, the prosecutor's closing argument did not rely on the death of Ms. Lamour to support the inference that petitioner's delay in hospitalizing her created a substantial risk of death.

This was not the only consideration against admitting the cause of death evidence. There was a serious issue of fact as to whether Ms. Lamour died of peritonitis or pneumonia. A substantial part of the trial was devoted to this collateral issue, thus creating a substantial risk of confusing the issue the jury had to resolve. More significantly, the evidence that death was caused by chemical peritonitis from the infusion of Isocal was particularly prejudicial because the prosecutor alleged in the indictment and introduced evidence at trial that it was petitioner's mistake that caused Ms. Lamour to be fed Isocal through the peritoneal dialysis catheter. While the prosecutor took umbrage at defense counsel's suggestion that she was trying to prove that the petitioner "killed this woman," the following colloquy indicates that the trial judge had no illusions on this score:

Ms. Morgenstern: .... We have all along stated that we are going to show she died of peritonitis. That's the medical cause of death. And I find it highly irritating he keeps saying that we are going to prove his client killed this woman.

The Court: Who caused the peritonitis?

Ms. Morgenstern: It came from the feeding solution. There is evidence a lot of people put feeding solution in—

The Court: Who ordered it? Who caused the death? That's what you're going to prove. Stop arguing over semantics.

Tr. 149.

Under the circumstances, the admission of testimony that death resulted from the administration of Isocal may have been an abuse of discretion, because petitioner's guilt depended only on the creation of a substantial risk of death from the subsequent delay in ordering hospitalization and not on whether Ms. Lamour survived. Petitioner must, however, show more than this in order to obtain relief here. The standard for determining whether the admission of evidence is so unfairly prejudicial as to violate the Due Process Clause is the same one that the Supreme Court has applied to determine whether a defendant is entitled to a new trial when exculpatory evidence has been withheld. *See Collins v. Scully,* 755 F.2d 16, 18–19 (2d Cir.1985). It was recently articulated by the Supreme Court in *Kyles v. Whitley,* —— U.S. ——, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), in which the Court considered the defendant's claim that evidence had been wrongfully excluded:

[The] touchstone ... is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.

*Id.* at ——, 115 S.Ct. at 1566. Applying this rule here, petitioner would be entitled to a new trial only if there is a reasonable probability that the result would have been different if the cause of death evidence had not been admitted at his trial. *Id.* at ——, 115 S.Ct. at 1566.

While it may be a close call, I conclude for several reasons that this is a hurdle that petitioner cannot overcome. The essence of the charge alleged in Count One was the substantial risk of death created by petitioner's delay in hospitalizing Ms. Lamour. This would permit the jury to hear all the testimony described earlier that supported the inference that petitioner was responsible for creating such a risk of death. On a record that would have been silent on the outcome for her, the possibility was evident that this already weak and debilitated seventy-eight-year-old woman did not survive.

More significantly, this was not a case in which inflammatory evidence, such as gruesome photographs of a murder scene, is admitted and it is not possible to neutralize the

resulting prejudice. Petitioner offered persuasive evidence from distinguished physicians that Ms. Lamour did not die from chemical peritonitis and that her death was caused by pneumonia. On my reading of the trial record, their testimony, which was accompanied by detailed reasons and objective evidence, was far more persuasive than the testimony of a medical examiner who, without an autopsy, simply inferred that she died from chemical peritonitis because she had chemical peritonitis. Even without the benefit of the persuasive amicus brief of the New York State Society of Pathologists casting doubt on the validity of this conclusion, the defense case on this issue was compelling. Indeed, it was far more so than the hesitant testimony that the defense offered on the critical element of whether the risk of death from the delay in treatment was substantial.

Moreover, the prosecutor did not mention the fact that Ms. Lamour died in her opening statement, and she was careful to "stress" that petitioner was not on trial for ordering that Ms. Lamour be fed Isocal through her dialysis tube:

> This is not a malpractice case connected with the feeding into the wrong tube by this Doctor or by any of the nurses who followed his instructions. His feedings that he ordered and which were done are really the backdrop to this case.

Tr. 13.

The prosecutor's summation, however, was somewhat more problematic. She alluded to the cause of death evidence twice. Once to counter the somewhat disingenuous suggestion of Dr. Baden that, even if Ms. Lamour died from chemical peritonitis, the cause of death on the death certificate should have been listed as a "therapeutic misadventure" and not as "accidental," Tr. 1203; and once in the concluding part of her summation. The reference to Dr. Baden's testimony came after the prosecutor's discussion of Dr. Arden's testimony classifying Ms. Lamour's death "as an accident," Tr. 1472; she continued, "Dr. Baden called it a therapeutic misadventure. I submit to you that a therapeutic misadventure might be something where an individual doesn't die. This individual, according to Dr. Arden's testimony, died because of the chemical peritonitis and even Dr. Baden, the defense expert could not rule out peritonitis as the cause of death." *Id.* The question of whether Ms. Lamour's death was "accidental" or the result of a "therapeutic misadventure," which was wholly irrelevant to the case, focused the attention of the jury on the effect of the mistaken order to administer Isocal through the peritoneal dialysis catheter. In so doing, it contributed to confusing the issue of the consequences of that mistake with the issue of whether the effect of the delay in hospitalizing Ms. Lamour created a substantial risk of death.

The second reference to the cause of death came at the close of the summation when the prosecutor argued that "when this Doctor decided three times to keep Alida Lamour at JHMCB Nursing Home on May 20 he put in motion a series of events leading to her death." Tr. 1477. The purpose of this reference, and perhaps the earlier one, may have been to emphasize why petitioner was being prosecuted for what the jury may have perceived was simply medical malpractice. *Cf. United States v. Gilliam,* 994 F.2d 97, 101 (2d Cir.1993) ("Without full knowledge of the nature of the crime, the jury cannot speak for the people or exert their authority.").

Nevertheless, the cause of death evidence was not offered for the purpose for which it was used in summation. Nor were there any instructions to guide the jury on the limited purpose for which the cause of death evidence was admitted or on how it should be used. Considering the marginal relevance of Dr. Einaugler's responsibility for the feeding order and the limited relevance of the fact of Ms. Lamour's death, and considering the prejudice of the two items in combination if the former caused the latter, there is a compelling argument to be made that it was error to admit the cause of death evidence. I am, however, presented with this issue in a habeas corpus proceeding and am, therefore, bound by the high standard articulated in *Kyles* for constitutional evidentiary error under the Due Process Clause. After carefully reading the entire record, I am unable to say that there is a reasonable probability that petitioner would not have been found guilty if the evidence of death had been excluded.

### Conclusion

■ I have exhaustively addressed the principal grounds raised in petitioner's appli-

cation for a writ of habeas corpus. Petitioner has raised several other claims that are without merit and do not require extended discussion. There is, however, one overarching argument that petitioner makes that deserves a brief response. Specifically, petitioner contends that he is being held criminally responsible for the reasonable exercise of his professional judgment. Petitioner's Mem. of Law. at 26. If there is one fact that emerges without contradiction from the record, it is that petitioner did not exercise any independent medical judgment regarding the care of Ms. Lamour after he learned that she had been fed Isocal through her peritoneal dialysis catheter. Instead, petitioner sought the advice of another physician, whom he regarded as far more qualified than himself to deal with the medical crisis created by his initial error. The principal dispute at trial was whether petitioner followed the advice he was given. The record of the jury deliberations, as reflected in the requests for readbacks and instructions, indicates that the jury focused on this dispute and resolved the central credibility questions in a careful manner before finding that petitioner consciously disregarded the advice he was given. Tr. 1552. Under these circumstances there is no occasion to consider arguments that would otherwise arise if the record supported the claim that petitioner was being held criminally responsible for a good faith exercise of professional judgment.

Accordingly, to the extent that the petition for a writ of habeas corpus challenges the validity of the judgment of conviction, it is denied. Petitioner's challenge to his potential confinement on Rikers Island, which he contends would violate the Eight Amendment in light of his susceptibility to tuberculosis, is premature and is dismissed without prejudice because the institution where petitioner will serve his sentence has not yet been designated.

SO ORDERED.